I'm going to try to reserve three minutes for rebuttal, your honors. I'm Carl Gunn. I'm representing Mr. Kenney. Subject is a court-directing e-health order. I'm going to focus my sentencing argument on the California Kidnapping Constitution for a couple of reasons. First, you already heard argument on the Arab Bank Robbery 924c issue. Second, the Affordable Care Act enhancement has a much bigger impact on Mr. Kenney's sentence. And third, frankly, at the risk of advocate bias, I frankly think the California kidnapping issue is an extremely strong issue. And the court really needs to give it a serious look. The court will do that. Maybe, but maybe not. Let me just ask you this. You conceded in your reply brief that your review does apply to this issue or not. Well, actually, I conceded in my opening brief, too. I didn't see it in the standard review. So if that's true, then I don't know how we could do much of a searching analysis of some of these issues. Well, because just to answer this, so just let's just take the first problem. I know you're doing your analysis, and I know you're in your office, right? But the title of the client itself certainly suggests that it's incredibly important, right? Kidnapping? I know it's not just street kidnapping, but it's even kidnapping. I don't think it does, Your Honor, because kidnapping actually can be a lot of different things in a lot of different jurisdictions. So at the very least, you've got to look at the language in the statute. Well, I think it is helping. Just help me with that first problem, because the district court judge, again, the pre-sentence report, let's just say it's a kidnapping. It's a straight-up common law kidnapping, right? The defense lawyer is not saying any objections to the pre-sentence report. No, we're good with it. Violet and I, as the district court judge, think, oh, you know what? I'd better break out the statute and go through and check it, and I'll find cases to see if this is really a crime of violence. Well, two things, Your Honor. First of all, we started with it when you mentioned the defense attorney not making any objections. Again, my second issue, which I'm going to get to, but first of all, let me answer. I don't think it's obvious just because the statute uses the word kidnapping. I think what's obvious here are two things that, taken together, make the error obvious. First of all, it is obvious from Johnson 1 on defining force, and from the opinion, I think, Your Honor actually wrote in, and I believe it's Dominguez Marioki, that the force has to be a violent force capable of causing pain or injury. Three examples of things that are not violent force are the ones you listed in Dominguez Marioki, chasing a person and bumping him, walking up to a person and jolting his arm, grabbing a person by her jacket. That is obvious. Those two legal principles are obvious, and I think you look beyond the statute language you did to that. Then what is also obvious is what the California case law establishes qualifies as kidnapping. I think under a plain error review, you do look at the underlying case law, especially for a statute defining kidnapping, called kidnapping, because kidnapping can mean lots of other different things. I mean, Your Honor, you've done a magnificent job, I think, in your brief, laying out all of the nuances of California cases that have been found. But Your Honor, I'm sorry to interrupt, but I really don't think they're nuances. I mean, it's plain there in the face of about seven or eight cases, that things just like pulling on someone's jacket qualify. Well, Your Honor, there are nuances in the sense that if I didn't have someone point those cases, direct my attention to those cases, I would not have guessed that California defined kidnapping down to the level that does qualify. Well, I think any reasonable attorney or judge would know that kidnapping varies in different jurisdictions. So just the word kidnapping means nothing. I think that is obvious. The second thing, then, to find out what kidnapping means, it's obvious that you have to look at the state statute and case law. The state statute says force. After Johnson, it's obvious that force means different things in different jurisdictions. So you have to look at the case law for the examples of what force are. And the case law makes it obvious that something like pulling on someone's jacket and getting them into a car is force. It makes it obvious that someone threatening to unlawfully arrest someone is force. It makes it obvious that in the case of a child victim, just carrying the child somewhere is force. It makes it obvious that telling a parent, I'm going to take your child, is force. So it really is, I think, the plain air case law uses the word obvious for that problem. It's obvious that kidnapping can mean different things in different jurisdictions. It's obvious that the force is force. It's just that it can mean different things, or that you almost think that it means different things. I'm sorry. You're saying consistent that kidnapping can mean different things because of the things you've reviewed. I just can't. But doesn't it mean something on the state's office when you say kidnapping? Because you're not talking about a nice thing. No. Are you talking about a crime? You're not. What's thought to be a very serious crime. Well, but you're not talking about force unless, depending on the jurisdiction, there's lots of jurisdictions that make kidnapping by fraud. In fact, California now. I'm serious. I don't think it's much information. But getting back to what Judge McCormick was mentioning earlier, as a district judge, you're suggesting that it is so plainly obvious that it's not so obviously serious that every judge would file a protection from either council. But along with that, there's loads of research.  I want to be sympathetic with district judges, Your Honor. I'm actually a good officer. I'm not criticizing the district judge here. But plain error is a little bit more than we blame the district judge. I mean, I'm okay with excluding Melanie Harmon from the district judge. But I'll say this, it was so obvious you could get that you should have spotted me without the bathroom. And your assistant, the probation officer, perhaps. But I guess where I go, Your Honor, is it is obvious that kidnapping means different things in different jurisdictions. I mean, I think everybody knows that. So then because obviously you have to look and see what kidnapping means in California. No, I grant you the first part, that it does mean different things in different jurisdictions. But I don't know. I didn't until I read your brief. I have any clue what California courts have said kidnapping means. But as a district judge who has that case in front of them and the defendant makes no objection, why would I think that if that California defines kidnapping in a way that disqualifies a crime of violence, I would have assumed that that's true. I would hear from someone like yourself tell me. But it's not plain error just because a defense attorney, you know, get around plain error just by the defense attorney not making an objection. Otherwise, you'd never have plain error reversal, right? I mean, there have to be some situations where the lack of an objection, they're still plain error. I think you could have said robbery after Dixon, right, that would have been plain error because, well, we have a case from our circuit that does not qualify. Actually, this was kidnapping after a Ninth Circuit case that held it was kidnapping only under the residual clause. Now, you would have to look carefully to find out that that statute story provision only took effect in 1990. So there was here a case that said California kidnapping doesn't qualify under the fourth clause that existed at the time. A different kidnapping provision. But if you're going to give the judge sort of the excuse or explanation of knowing there was a different statute in 1990, then I think he also has the responsibility of looking at what the statute was in 1990. He would see the word force. We're talking about the 74, which we're looking at, not the 93. Right, right. He'd have to look at what it was before 1990. And the one before 1990 uses the word force, but he knows after Johnson that force means different things in different cases. I don't have to rely on the defense lawyer to tell me, because it otherwise seems like this is going to be a match. And if it were, it's because California has this, you know, I suppose maybe it's not a difference, but it has a different version from what one would typically expect. I don't think it's different from what one would typically expect, frankly. Typically, it's all over the map. What's the common law definition given? I'm asking what the common law definition is. And then it is for use of force or intimidation, something like that. He, you know, takes it over to a different case. It wouldn't surprise me if a majority of states include kidnapping by fraud. I know there's lots of states that do. Your Honor, since we're on this issue, let me talk about why he should have gotten a new attorney, in which case there would be a remand anyway. And then this obviously could be dealt with, because I'm sure any attorney on remand would raise this issue, especially after I talk to him and show him my briefs, if nothing else. The government says it's Mr. Kinney's fault, because he stopped talking to his attorney. That is clearly not dispositive under this court's case law, because I've cited you at least four cases. And you've seen four lawyers. Yes. You were 40, so you got rid of three. Right. This is number four. Right. So he worked with each lawyer through a stage of the proceedings. I think there's good reason to think he would have worked with another lawyer through sentencing. But I've given you cases that say, here's what I mean by the attorney is F, and look at what this attorney did. Look at what this attorney did, Your Honors. I'm not going to try to use some harsh language, but first of all, he knows Mr. Kinney, in his own words, in the attorney's own words, is someone who likes to dot his I's and cross his T's. I asked my wife the other day, is that a bad thing? And she said, well, no, not necessarily. I think in a criminal case where someone's facing 27 years, you probably want to dot your I's and cross your T's. He knows Mr. Kinney is someone like that. He just shows up some day with a probation officer to do a pre-sentence interview, no meaning to prepare him. Then what does he do? Mr. Kinney says, no, I want to prepare. He sends Mr. Kinney a pre-sentence support packet to fill out. In his cover letter, he says, this is due by January 22nd. Mr. Kinney assumes he has until January 22nd. Then the attorney shows up with a probation officer again on January 20th, and Mr. Kinney hasn't had a chance to fill that out. So on that side of the pie, I would submit it was hardly unreasonable. It was hardly manufactured discontent, which is the language used in the cases for Mr. Kinney to say, I want a new attorney. What preparation with Mr. Kinney being involved in this has changed things, because I guess he's reviewing it to see what he has for objections, but there's a lawyer's responsibility to be prepared for the involvement. I did trial lawyering for a long time, Your Honor, before I started doing just appellate practice. I always wanted to meet with my clients and prepare them to make a good impression. I'm not arguing with that. I'm saying the issue that you have, the matters you have an issue with is the matter of, I think that was an objection to. That's my view. What I'm saying is, what I'm arguing, under the case law, the question is whether Mr. Kinney was reasonable and had a reason to not want to meet with his attorney or want a new attorney. And I'm saying when someone is a person who wants to be prepared, and their attorney just shows up with a probation officer, what is it that he's preparing that's requiring us to, other than the failure of the lawyers, to raise objections where they can. Just getting him ready to present a good impression. I'm not arguing here that ineffective assistance. I'm arguing under the case law about new attorneys that he has a good reason to be dissatisfied. And that's not all, because look at what the attorney did on the campus suit. First of all, the attorney didn't do what I think after his camps at Johnson, any reasonable federal attorney would do, and that's look at the state case law for a kidnapping prior and find the argument I made. It is not, I mean, I sometimes make off-the-wall arguments, Your Honors. I get what they call creative and what prosecutors sometimes call something else. This is not some creative off-the-wall argument. This is a solid, I would submit, strong argument. I'm arguing to you it's plain. This is the argument you should have been making. But that's not all. There are some attorneys out there who say, well, I'm not a lawyer lawyer. I'm not a law lawyer. I go with the facts and the equities. So what else is there? And sentencing? What kind of argument did this attorney make? And this goes to the issue of abandonment of the client, which is another factor in deciding whether a request for a new counsel is reasonable. What does he do? The guideline raised here is, I think, 272 to 319 months. You have a 65-year-old man. Probation recommends the high end 319. Your Honors and District Judge, how often do attorneys come in and agree to the high end when the prosecutor's not even asking for something more? What does this attorney do? He comes in and he says submit on the probation report. He has the safety and nothing to offer. He asks the judge to follow the probation report, which is the high end. He doesn't even say to the judge, well, gee, Your Honor, we have a 65-year-old man here. I think 272 months is going to get him in prison. He says no. So under the case law, Your Honor, I've given you four cases that say even when the defendant starts speaking with this attorney, request for substitute counsel sometimes has to be granted. And the test is whether there was this case called manufactured discontent or whether it was reasonable for the defendant to want a new attorney. Here it was reasonable because he just wanted to be prepared for the pre-sentence interview, and he has a defense attorney who twice shows up without even giving him any notice of it, let alone meeting with him to prepare. And second, you have a defense attorney who engaged in absolutely no sentencing advocacy at all, and in fact, affirmatively asked the court to give him the high end of a 272 month to 319 month range instead of the low end. I hope we can sell some time for a bottle. I obviously have other issues. I would also ask the court to look more carefully at the plain air context, but you don't need to get there. If you send it back for a new attorney anyway. Okay. We'll give you some time for a bottle. Thank you very much. Good morning, Your Honor. Good morning.  I'm going to start with the issue that the panel hasn't touched on yet, which is this suppression issue. And Kennedy, in his reply, notes that it was unreasonable for the police to use the amount of force they did for this detention because all he knew was that they were dealing with an armed bank robber. I think, though, that it's precisely the case that they were dealing with an armed bank robber that made this use of force reasonable. That's what this court's files case, which says police may use more intrusive detention tactics when they have reason to believe the suspect is armed, or when the encounter closely follows a violent crime. That's what the police had in this case. They had a dispatch report that a defendant, or a suspect had just robbed a bank with a gun that he was headed east on, that he was fleeing on a bike and had a helmet. And within three minutes of that report, only a quarter of a mile away, and on the first street that you would turn on if you were headed east to flee from this bank, Officer Parsons encountered the defendant. Under those circumstances, the safety threat is what justified his use of a drone out of his guns, ordering Kenny out of the car, and eventually handcuffing him and placing him in the back of the squad car. And that's what distinguishes this case from the cases that Kenny cites, Ricardo D. or Krauss, Washington v. Lambert, where this court went to great lengths to say there's no great line of rule of when a detention becomes an arrest. I wondered about that. They can advertise so quickly, considering that the defendant had left the bank on a bicycle with a helmet on. Now he's in another vehicle with no helmet and no bicycle. This is pretty flimsy. It's just happened to be another car coming down the road. I disagree that it's tender honor. I believe it's sufficient for a reasonable suspicion to detain him. And that's also because the van was parked on a street that the officer, in his years of work, had never seen a van parked there. And the defendant was walking around the back of a van wearing long clothing, even though it was a warm day. The fact that it's a van I think is significant, too, because the defendant could have placed a bike in there, just as he actually did. Now, under those circumstances, he was reasonable for the officer to pull the vehicle over and order him out. A fact that came out at trial, which under this court's precedent in Sanford, which is 673 F. Senate 1070, the court can consider facts that come out at trial, even if they're not at this present hearing. At trial, Officer Parsons testified that when Kenny was on the ground at gunpoint, even before he was handcuffed or placed in the squad car, that Kenny said that there was a gun in the car. Before he was placed in the squad car, Officer Hart frisked him and found a loaded magazine cartridge and a police scanner that was tuned to the Modesto police station. So even before he was placed in the squad car, even before he was handcuffed, there was at least reasonable suspicion, but I believe it needed probable cause. Now, there definitely was a probable cause. I don't even know why you were trying to make that a reasonable guess. If you barely have a reasonable suspicion, you can just make that a reasonable guess. Why do you obtain the other reasons that counsel actually did arrest him? Yes, Your Honor. So on the issue for a new attorney, the defendant, there must be defendants on the defendant's ability to get a new attorney when he's manufacturing a conflict, which is what he does here. And he focuses a lot of his attention on this issue with the timing of the pre-sentence report interview. But it's not just the PSR. The issue that Kenny couldn't move past with any of his four attorneys was that he lost a suppression hearing. And on day three of trial, right before closing arguments, he asked for a new attorney. He mentioned it. He said that he recognized that ER 229, that the main issue in this case was suppression, and that none of his four attorneys had been able to elicit any of the facts he hoped they believed. Is this a significant time that, as counsel, the post-counsel said, that a defendant should be able to have the time to review the pre-sentence investigation report and to discuss it fully? Would you agree with that? I do agree that that's important. But I think what the court recognized, and the reason it didn't recuse the suppression, is it saw this suppression issue drive a wedge between each of his attorneys. And that's why this case is so similar to Mendoz-Sanchez, where the defendant had his first attorney, and the attorney would try to discuss evidence with him. The defendant would fade the room. Does the record indicate to you what the underlying reason was, what was it specifically he needed to actually prepare for? As counsel, about that, it's just vague to say, oh, I need to prepare. Was there something to release you, Lord, about the record or something that was not particular to the end line? No, Your Honor. It's not clear what he wanted to prepare for. And I also note that in the PSR, in this case, in paragraph 41, way back in 1984, when he committed his second armed body corroborate, he also refused to interview with probation at that time. So even this is a pattern. His refusal to interview is refusal to listen to his attorneys. And the district court recognized that. It said that on day three of trial, it said that it wasn't talking about the suppression issue anymore. Kenny's attorney said that Kenny kept wanting to relitigate the suppression issue, but he couldn't have passed it. Does the district court consider the post-interview conduct of counsel in sentencing as a part of his decision as to whether or not it was appropriate to deny the change of attorney? I believe the court can consider that conduct. And that's from this court's blocker case that the defendant cites, where the defendant asked for a new attorney prior to trial. And then during trial, it was clear that he and his attorney weren't communicating. His attorney even said that they weren't communicating and that because of that, she was unable to put on any defense. But I also disagree with the argument that Kenny's attorney abandoned him at sentencing. And even though he didn't object to the PSR event, he didn't do anything. I don't know how you can come to any other conclusion. So at this phase, the record is fairly unfilled. What led to his decision not to object? We actually have a little hint of it at ER 47. Kenny, when he was speaking at sentencing, went through a laundry list of issues that he had with his case. And during that elocution, he noted that his attorney had sent him a letter. And in the letter, the attorney said that he had done research on the PSR and that although the recommendation was high, that challenging it might be futile and even counterproductive. And it's that counterproductive part, I believe, that's significant because it recognizes that Kenny had two prior armed bank robberies. Those ones initiate criminal history points by just a little over a year. If those had been scored, he would have been looking at a guideline range of 360 to 1. I don't care whether you were involved in the drug or not, but your colleague, you guys weren't asking for anything other than a drink. It's not clear, Your Honor. It's not clear. Tell me, do you guys know what your position was at sentencing? Did you ask for your drink? It was on probation recommended. Nobody was suggesting that an upward departure was needed in the community, right? That's right. It was submitted on the recommendation of probation for 319 months. I mean, maybe you're right. I don't know. Defense counsel, I haven't talked to him. Maybe you have. So I don't know if you guys all might have thought there was some risk that asking for a drink would be counterproductive. I would be shocked if that were in any way a reasonable strategy going into a sentencing, especially as far as the 65-year-old man. Yes, Your Honor. I mean, to hear you say that the counselor is not independent, I don't know, Mr. Kinney, I think he's our agent. I read that transcript and could not believe how deficient the performance was. And I understand why Mr. Kinney was appointed a lawyer. I'm way sure that you guys, if you were in issues, would capture not one of the particular conductors in the community. And, again, Your Honor, at this case, we don't know what went into that decision, but the letter is really the hint that we have right now. And I do believe that his attorneys thought, based on his statement that it could possibly be counterproductive, that it could have gotten worse. At the very least, it shows that he wasn't just sitting back and doing nothing. And, again, that's why the district court didn't use its discretion earlier, is that it saw that this issue with Kinney, it manifested itself repeatedly through his number of attorneys. The court recognized that and even stated that the case still wanted to talk about the motion to suppress, even through trial, even through sentencing, even when it wasn't a viable issue. And that's why this case is closer to Mendoza-Sanchez than cases like Adelzo-Gonzalez or Velazquez. In Adelzo-Gonzalez, the attorney was openly threatening his client in court. He stated that he was willing to seek his client for 105 years if he didn't accept the plea. Or he called his client a liar. He tried to prevent his client from presenting a motion for a new attorney to the court so he knew that his client was going to obstruct justice. Let me ask you guys just one more question before I want to ask you about the kidnapping thing. I remember, right, the stories that we were talking about, and he did give me in front of you those efforts to have him removed. And I remember Mr. Kinney saying in sentencing, I don't know if he was talking to the guy, he said, I don't even understand why you fought to keep stay on this case. Because you didn't do anything for me. And I said, yeah, why didn't you? Why was he opposing Kinney's motion to have him replaced? He just turned around and basically did nothing to help him. Yeah. Two points on that. So first off, his attorney did oppose it. He said, I want to stay on this case. He said, we're still communicating. He also spent some time clarifying some of the factual claims that Kinney had made against him. So Kinney, for instance, said that his attorney had been cramming the night before trial, and his attorney disputed that. Or they disputed when they met, what time, and what they discussed. And Kinney's attorney responded to that. But the mere statement that I want to stay on the case or I'm prepared, I'm ready to go forward doesn't show that there's a reconcilable conflict or that there's a breakdown. That actually happened in Dundas-Sanchez, where the attorney said, we're still trying to communicate. He just doesn't want to listen to us when we talk about evidence with him. And so in that case, the court still found that it wasn't an abuse of discretion. And the fact that Kinney's attorney did essentially the same thing that the attorneys did in Dundas-Sanchez, where he said, we're still communicating, I'm still ready to go forward, doesn't necessarily evidence a breakdown here. But she's doing a good job. Yeah. Your Honor, I agree with your statement that it's not plain error in this case. And even as the court had broken out the statute and pulled it up and read the cases, the cases say that for California kidnapping for robbery, the defendant must use force or threat of force. And even the cases that Kinney cites, at least arguably, fall within the scope of Johnson's definition of violent force, which is force capable of causing physical pain, similar to a slap. Jay notes that in LaSalle, the defendant threatened the victim, saying, if you want your child, you'll have to get in the car with me. And in LaSalle, the court noted that it's not just an empty threat. It's that threat that, if you don't get in this car, I'm going to hurt your child that makes you kidnapping for robbery. In Key Inventory, for instance, the victim was pulled into the car. The defendant drove 60 to 70 miles an hour down the freeway so she couldn't jump out. And then when she tried to get out, the defendant turned the car and slammed the door into her, which caused her to stay in the car, even as she jumped out and sustained injuries when she was bailing. These cases show that it is violent force that's force capable of causing physical pain. Perhaps the outer limits of California kidnapping for robbery would be People v. Castro, which is where the defendant was driving up alongside the victim, said, I'll give you $10 if you let me lick you, and got out of the car and grabbed the victim and pulled her toward the car. And he pulled her hard enough that she took two steps toward the car. And the court said that that was force sufficient for kidnapping for robbery, which is close and similar to a slap in the face. But significantly, the court in that case noted that if the defendant had just grabbed and turned the victim, that wouldn't have been enough force. And so, at the very least, these cases show that it wasn't plain error for the district court to consider California kidnapping for robbery to be a violent felony. They didn't think this was just straight kidnapping, right? At least when you actually pleaded guilty to it. I pleaded it was kidnapping for robbery. Did you write the brief? Yes, sir. You got it right on the brief. I mean, it decreases in this report. It says kidnapping is for purposes of robbery or something, constants like that. But I think when we know that that charge was dismissed, you actually plead guilty to just a straight case. That's what you said, correct? Correct. And the only difference with the for robbery part is that the victim must be taken and moved for an amount of time that's not incidental. And so, the amount of force would be the same still. And I believe that the district court, even if it had the benefit of full briefing on the issue, these cases fall within Johnson's definition of violent force because it's more force than just bumping a victim, grabbing a victim's jacket, spitting in a victim's face. Those are all the examples from Dominguez, Romero, and Hioki. And in these cases, it's more than that. It's pulling a victim into a car. It's pushing a victim, threatening to arrest a victim, which still carries the implied threat that if the victim doesn't comply, that the arrest would be completed using force. And so, at the very least, it's not plain that these cases fall outside the scope of Johnson's definition of violent force, and that's why the kidnapping for robbery was properly considered. At the very least, this court's going to confirm on a plain error again. Kidnapping. Oh, that's so good. You got it in a second. You got it in a second. Okay, do you have anything else? No, Your Honor. The panel has no questions. Okay. Thank you very much. Let's give you two minutes for a while. Let me first go through a little laundry list of notes they made about the points my opposing counsel made on the attorney's representation. One thing he said, well, he said at the hearing they were still communicating. It seems to me as an officer of the court, he had an obligation to let the court know when that's hot, because that communication stopped soon after the hearing on the 19th. And Adelzo Gonzales, he distinguished that by saying internally openly threatened to get his client under five years. Well, here the attorney actually asked for more time. He asked for the high end of the range. The attorney sent this letter about having done research and it would be futile and counterproductive. Well, I submit, given the research I've shown, Your Honors, that it was pretty careless research. I also submit, just like I think, Your Honors, I do offer seducing. I don't see any way how it's going to ever be counterproductive to just say, this guy's going to be 80 when he gets out no matter what. Let's get him the low end of the range instead of the high end of the range. There's this argument that it's like Mendoza-Sanchez and it was going to be the same issue with another attorney. It wasn't going to be the same issue. Mr. Kinney at the sentencing, new sentencing counsel hearing, was not talking about this suppression issue. He was talking about sentencing stuff. Certainly, in addition to, he was generally having fun, but he didn't like being convicted. But he was talking about the sentencing stuff. And that's very different. Mendoza-Sanchez, the judge drove his hand, said, Liz, you're going to have the same problem with the next attorney. Well, Mr. Kinney wouldn't have the same problem here. The problem now with sentencing, all he wanted to do was have an attorney who met with him before the sentence and who, at the very least, had us the low end instead of the high end. You've got my brain thinking. I'm sorry. Your Honor, counsel's argument that there is a reason not to bring it up because if they looked at his prior, his level would go higher. I don't think that's correct, Your Honor. When the government is not even arguing for the high end, I don't see that as realistic at all. You have a guy who's been clean, if I can use the vernacular, for 15 years. He lived a period, and maybe there would have been more than just how he was clean for 15 years. If they had been prepared for the precedence interview, the defense attorney could have said what he'd been doing those 15 years. I don't see any realistic risk that by asking for the low end of the range and by making a legal argument about California kidnapping, that that's going to be counterproductive or futile. You certainly don't. It could have at least been silenced. In that case, you say, get my client what probation recommends. I don't, I mean, Your Honor, what I guess there were district judge before the guidelines. Your Honor, some district judge to the guidelines. I mean, you go on and ask for 272 months instead of 319 months, and all of a sudden the judge is going to say, no, I'm giving more than probation is recommending. I can't imagine that. And you have a client here who just wants, he wants to dot every i and cross every t because he's facing lots of time. Is it so much for him to be upset when his attorney doesn't even meet with him before the precedence interview and just shows up without telling him they're coming? That makes the breakdown in communication here not unreasonable and manufactured discontent, but reasonable discontent. You don't need to decide the kidnapping issue if you're going to remand on these grounds. I think you should. I think you have to look beyond the word kidnapping and deciding whether or not it was obvious. But at the very least, he deserved a new attorney. I didn't get a chance to address the reasonable suspicion. Your Honor, I think it was more than thin here. Without a finding on the helmet issue, there was no way there was reasonable suspicion. You have someone in a public area, a public sort of commercial residential area. He's a little bit rushed, not running like you'd expect a bank robber to be. He is not a bicycle when the robber is supposed to be on a bicycle. I think I covered that. Yeah, you covered that, Your Honor. I don't think there's reasonable suspicion with that. Thank you very much for your arguments. The case to start here will be submitted. We are going to take a short recess, so five minutes. Okay. And we'll be back as well. Thank you.
judges: Wallace, Watford, Sands